The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Mary Moore Hoag. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Defendant Drexel Heritage Furnishings was self-insured with Associated Risk Services Inc. as the adjusting agent.
4. Plaintiff was out of work for the periods of September 10, 1992 to December 6, 1992 and from December 29, 1992 until the present time.
5. Neither party stipulated to the accuracy of the Form 22 submitted. Both parties stipulated that $100.00 should be credited to the amount on the Form 22 as being a part of plaintiff's salary.
6. The medical records of Dr. Deaton were stipulated to by agreement of counsel on February 14, 1994.
7. The attendance records of plaintiff from 1991 and 1992 were also stipulated to.
8. The issues for resolution are as follows:
 a. Did plaintiff develop an occupational disease arising out of and in the course of his employment with Drexel Heritage Furnishings?
 b. If so, to what amount is plaintiff entitled for temporary total disability benefits?
 c. If plaintiff's claim is compensable, is defendant entitled to a credit under N.C. Gen. Stat. § 97-42 for payments received by plaintiff pursuant to a group disability policy?
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. At the time of the onset of his alleged occupational disease, plaintiff was a forty-six year old male, employed by defendant Drexel Heritage Furnishings as a band saw operator. He had completed the seventh grade.
2. Before being employed by Drexel, plaintiff was a band saw operator and a rip saw operator at Emerson Leather from 1986 to 1989. From 1983 to 1986, he was employed at P G Chair in Longview as a Simco boring machine operator. From 1981 to 1983, plaintiff worked at Lacowana Leather in Conover tailing a paint machine. From 1969 to 1981 he was a router, sander and boring machine operator at Hickory Furniture. Plaintiff never had any problems with his hands prior to his work at Drexel.
3. At Drexel, plaintiff contributed $1.40 per week, representing 35% of a total premium for a short term health disability plan. The plan paid disability insurance benefits for plaintiff from September 6, 1992 through March 24, 1993 at a gross amount of $135.00 per week from which taxes were deducted.
4. At Drexel, plaintiff was a "rough" band saw operator, a saw which had considerable vibration. His duty was to cut posts for table and chair legs in addition to cutting cap rails, drawer bottoms and corner blocks. He did not engage in work on side panels or do any other type of finishing work. Plaintiff spent from 70% to 75% of his time cutting out posts from which the legs for chairs, dressers, chests and night stands were fabricated in processes further down the production line. When cutting out posts, plaintiff made from four to six cuts on each post. In an eight hour day, he would cut between 300 to 350 posts and in a ten hour day he would cut approximately 375 posts; thus, making from 1,200 to 2,100 cuts per day.
5. A videotape depicting three workers and prepared by the defendants was introduced as evidence. One of the workers depicted therein is Albert Fletcher; the second, is a Mr. Ault and the third is plaintiff. Mr. Fletcher makes side panels in the first segment, involving fine cutting and stacking. Mr. Ault, in the second segment, cuts and off-loads cap rails and marking out pieces. In the third segment, shorter than one minute in duration, plaintiff cuts posts using a new carbide tipped blade, not his usual equipment.
6. At the hearing, plaintiff demonstrated his job. He began with a square block of wood. He made cuts on the block with swinging motions. For cutting, plaintiff let the block lie flat on the band saw table. He held the flat part of the post down against the table by use of his fingers pressing on the side. Plaintiff used his hands, wrists, elbows and shoulders in guiding a piece of wood through each of the motions, maintaining pressure on the wood at all times. Cutting the block of wood exactly and precisely square, required placing pressure on the wood by the left hand. If the pressure is relaxed, the saw blade may jerk the wood down on the table and cause unsquare cuts. Plaintiff used his right hand as a guide. He cut some posts bigger and some posts smaller than the ones indicated on the video. The piece of wood utilized by plaintiff at the hearing was approximately four feet long and two inches square and was not a piece of Drexel stock. The cuts in the wood were made prior to the hearing and were held together by tape. Plaintiff placed the wood on the Deputy Commissioner's desk as he demonstrated how the wood was pushed through the band saw.
7. Plaintiff always worked with the same saw which had a bad vibration. Plaintiff's fellow employee, Carl Peterson noticed the fact that plaintiff's band saw had a good deal of vibration. Mr. Peterson observed wood falling off plaintiff's machine due to those vibrations.
8. Plaintiff experienced problems with his hands and arms in March 1992. He consulted Dr. Brezicki who gave him arm splints. Plaintiff had been Dr. Brezicki's patient since early 1989. No notations regarding neurological or musculoskeletal problems with the upper extremities are present in medical histories prepared by Dr. Brezicki before March 22, 1992.
9. Dr. Brezicki has been a medical consultant to Lexington Furniture Company as well as Autumn House Furniture Company, and has toured furniture plants and viewed band saw operation jobs. Prior to being deposed, Dr. Brezicki also viewed the video prepared by defendants, including the segment where plaintiff illustrated his work.
10. After plaintiff's March 27, 1992 visit, Dr. Brezicki diagnosed carpal tunnel syndrome as well as left medial epicondylitis of plaintiff's left elbow. Besides prescribing splints, Dr. Brezicki injected plaintiff's left elbow and prescribed Vicodin for pain. Plaintiff reported numbness and weakness in his left arm on April 24, 1992. The doctor prescribed anti-inflammatory medication at that time.
11. On August 14, 1992, plaintiff presented to Dr. Brezicki with additional symptoms of pain and numbness in his wrist and fingers. He had numbness over the median nerve distributions in both hands, and also numbness over the left finger. Dr. Brezicki recommended nerve conduction studies. The nerve conduction studies revealed bilateral carpal tunnel syndrome, more pronounced on the right side and left tardy ulnar nerve palsy.
12. On August 25, 1992, Dr. Brezicki wrote a letter to the Drexel Heritage Furnishings personnel director, advising that plaintiff had symptoms consistent with work related bilateral carpal tunnel syndrome.
13. Plaintiff went to Nurse Baker, the plant nurse, after being notified of his carpal tunnel problem by Dr. Brezicki subsequent to his August 14, 1992 visit.
14. Dr. Brezicki referred plaintiff to Dr. Deaton, a surgeon who also diagnosed bilateral carpal tunnel syndrome after reviewing plaintiff's nerve conduction studies. Dr. Deaton scheduled a right carpal ligament release which was performed on October 9, 1992. During the surgery, Dr. Deaton observed that the medial nerve was indented by the pressure of the carpal ligament on the nerve. Plaintiff's left wrist was operated on October 21, 1992 with similar findings. Plaintiff was released to return to work on December 7, 1992.
15. After working for two or three weeks, plaintiff continued to have pains in his wrists and elbow. On December 17, 1992 he returned to Dr. Brezicki presenting with persistent pain and weakness in the hands. He was taken out of work on December 18, 1992 and prescribed pain medication. Additional nerve conduction velocity studies were ordered. These studies confirmed the presence of ulnar nerve problems in both arms, worse on the left. Dr. Brezicki recommended an appointment with Dr. Scott McClosky and kept plaintiff out of work.
16. Dr. Scott M. McClosky is board certified in neurological surgery and has practiced neurological surgery since 1980. He has treated several thousand patients with carpal tunnel syndrome and about one thousand patients with tardy ulnar palsy. Dr. McClosky is a specialist in disorders of the upper extremity and his practice is heavily concentrated in neurological disorders of the hand and upper extremities due to the environment of textile and furniture in the area of North Carolina where he practices.
17. Dr. McClosky first saw plaintiff on January 29, 1993 and took a lengthy occupational history. On that date Dr. McClosky diagnosed grip weakness, bilateral Tinel sign in the ulnar group bilaterally, and bilateral dense numbness in the ulnar nerve dermatan that crosses the wrist bilaterally. The clinical exam correlated exactly with electrical testing. Plaintiff had tardy ulnar palsy in both arms caused by his work at Drexel. Dr. McClosky took plaintiff out of work. Plaintiff has been unable to return to work or to earn wages since that time.
18. Dr. McClosky performed surgery on plaintiff's left elbow on February 4, 1993 and on the right elbow on February 18, 1993.
19. Plaintiff returned to Dr. Brezicki on April 29, May 27 and September 10, 1993 presenting with very weak bilateral grip, joint inflammation in the hand and pain radiating into the arm. Additional pain medication was prescribed. By December 1993 Dr. Brezicki diagnosed carpal tunnel syndrome based upon positive Tinel and Phalen tests, decreased sensation in both hands and weak grip strength. Dr. Brezicki wrote Dr. McClosky, referring plaintiff for assessment for continuing peripheral neuropathy related to bilateral carpal tunnel syndrome and ulnar compression.
20. Dr. McClosky performed surgery for recurrent carpal tunnel syndrome on February 15, 1994 for the left hand and on June 28, 1994 for the right hand.
21. On May 4, 1994 Dr. Brezicki felt plaintiff's grip strength had increased on the left side. However, he prescribed medication to protect plaintiff's gastrointestinal tract against anti-inflammatory drugs. On June 9, 1994, Dr. Brezicki diagnosed tendonitis in plaintiff's thumb related to the carpal tunnel syndrome.
22. Plaintiff also had significant post operative pain. Dr. Brezicki had been writing plaintiff on-going prescriptions of Lorcet and Darvocet for pain. Plaintiff developed a chemical dependency to these medications. Eventually the chemical dependency resulted in plaintiff's August 1994 admission to Frye Medical Center for prescription drug dependency.
23. Dr. McClosky continued to treat plaintiff after he underwent surgeries in February 1993 on his arms. On May 18, 1993, Dr. McClosky diagnosed plaintiff with post operative osteoarthritis and recurrent carpal tunnel syndrome. Dr. McClosky limited plaintiff to light duty work and no repetitive use of the hands or lifting more than twenty pounds.
24. Dr. McClosky re-examined plaintiff on February 7, 1994. Dr. McClosky performed surgery on plaintiff's left hand on February 15, 1994 for recurrent carpal tunnel syndrome with non-infectious proliferative tenosynovitis. There were significant amounts of scar tissue around the nerve, the sheath around the flexor tendons was thickened and there was a mass within the area of plaintiff's carpal tunnel, compromising the area. The mass was the specific cause of the subsequent nerve irritation and compression. Right handed surgery was scheduled and occurred on June 28, 1994. A mass of thickened synovial tissue was located in plaintiff's right carpal tunnel area.
25. In August, 1993, defendant provided Dr. Steven Naso with a job description of plaintiff's work as a band saw operator, his medical records and the videotape depicting the work of three different employees including plaintiff. Dr. Naso, reviewed these materials and found no causal relationship between plaintiff's job and his medical condition of carpal tunnel syndrome.
26. On June 22, 1994, Dr. Naso's deposition was taken. Plaintiff's job was viewed by Dr. Naso as only mildly repetitive. Overall, and based on the video, Dr. Naso declared that plaintiff's position with Drexel did not involve a high degree of repetition and did not place him at an increased risk of developing carpal tunnel syndrome than a number of the general population.
27. Of great importance is the fact that Dr. Naso has never actually met plaintiff or examined him personally. Dr. Naso was not aware of the fact that plaintiff operated a rough band saw rather than a fine band saw as depicted in one segment of the video. Although plaintiff's actual work was depicted in less than a minute of the video, Dr. Naso placed equal weight on every segment of the videotape.
28. Based upon the fact that Dr. Naso relied heavily on the videotape which included only a small portion of the actual work which plaintiff performed and also that Dr. Naso never saw or spoke to plaintiff, the undersigned gives Dr. Naso's testimony less weight and credibility than it gives to the testimony and medical records of Dr. Brezicki, Dr. Deaton and Dr. McClosky, all of whom diagnosed plaintiff as having carpal tunnel syndrome caused by his work at Drexel.
29. There is thus competent, credible medical evidence in the record to prove with a substantial degree of medical certainty that carpal tunnel syndrome and tardy ulnar nerve palsy are characteristic of and peculiar to the job of a band saw operator and that plaintiff was at an increased risk for developing carpal tunnel syndrome over the general population as a result of his job at Drexel Home Furnishings as a rough band saw operator.
30. Plaintiff suffered from occupational diseases of his upper extremities including bilateral carpal tunnel syndrome, tardy ulnar palsy and recurrent carpal tunnel syndrome which necessitated his being absent from work and incapable of earning wages from September 9, 1992 through December 7, 1992 and from December 29, 1992 through the current time.
31. Plaintiff is entitled to workers' compensation for the periods when he was not capable of earning wages from September 9, 1992 through December 7, 1992 and from December 29, 1992 until such time as he undergoes a change of condition, returns to work or there is an order by the Commission.
32. Adding the $100.00 in bonus pay to plaintiff's salary on the Form 22 and averaging in the times which he actually worked, plaintiff's average weekly wage was $330.92 yielding a compensation rate of $220.61 per week.
33. In addition, plaintiff is entitled to all medical compensation for his treatments by Dr. Brezicki, Dr. McClosky and Dr. Deaton and medical compensation for any additional medical treatment which may be necessary to effect a cure, give relief or lessen his period of disability.
34. Plaintiff had not reached maximum medical improvement at the time of the hearing.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff developed bilateral carpal tunnel syndrome and tardy ulnar palsy, occupational diseases, due to causes and conditions characteristic of and peculiar to his employment as a band saw operator at Drexel Home Furnishings. Carpal tunnel syndrome and tardy ulnar palsy are not ordinary diseases of life to which the general public is equally exposed. N.C. Gen. Stat. § 97-53(13). Bookerv. Duke Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
2. By virtue of his occupational diseases, plaintiff was necessarily absent from work and was incapable of earning wages from September 9 1992 through December 6, 1992 and from December 29, 1992 through the current time, as long as he remains disabled, returns to work or it is otherwise ordered by the Commission. Plaintiff's average weekly wage was $330.92 yielding a compensation rate of $220.61 per week. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to medical compensation for all expenses involving his occupational disease including consultations with physicians, operations and ongoing medical treatment or treatment in the future which might tend to effect a cure, give relief, or lessen his period of disability. N.C. Gen. Stat. § 97-25.
4. Defendants are not entitled to a credit for the employer-employee funded disability fund because plaintiff was partially responsible for payment of the premiums. N.C. Gen. Stat. § 97-42. Foster v. Western Electric Co., 320 N.C. 113,357 S.E.2d 670 (1987).
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendant shall pay plaintiff temporary total disability benefits at the rate of $220.61 per week for the period of September 9, 1992 through December 6, 1992 and commencing December 29, 1992 and ongoing, subject to a change of condition, return to work, or further Order of the Industrial Commission. Plaintiff shall be paid in a lump sum for the amount of compensation which has accrued. This Award is subject to the attorney's fees hereinafter approved.
2. An attorney's fee in the amount of 25% of the compensation awarded herein is hereby approved for plaintiff's counsel. This amount shall be deducted from the lump sum awarded plaintiff pursuant to paragraph "1" above and thereafter defendants shall forward every fourth check for compensation benefits to plaintiff's counsel.
3. Defendant shall reimburse plaintiff for all accrued medical expenses and shall provide plaintiff with continuing medical care which will tend to effect a cure, give relief or lessen the period of plaintiff's disability from his occupational diseases, upon receipt and approval of statements from plaintiff's treating physicians.
4. Defendant shall pay the costs.
 S/ _____________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ __________________ THOMAS J. BOLCH COMMISSIONER
S/ __________________ LAURA K. MAVRETIC COMMISSIONER
BSB/rst/cnp 3/19/97